UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALYCE SOLIS, for JOSE E. SOLIS,<br><br>　　　　　　Plaintiff,<br><br>　　　　v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of the<br>Social Security Administration,<br><br>　　　　　　Defendant.<br>_____ | NO. EDCV 04-01378-MAN<br><br>MEMORANDUM OPINION AND ORDER |

　　　Plaintiff's mother filed this action on behalf of Plaintiff, a minor child, on December 1, 2004, seeking review of the denial by the Social Security Commissioner ("Commissioner") of supplemental security income ("SSI").  On December 28, 2004, the parties filed a "Consent to Proceed Before a United States Magistrate Judge," pursuant to 28 U.S.C. § 636(c).  The parties filed a Joint Stipulation on August 17, 2005, in which:  Plaintiff seeks an order reversing the Commissioner's decision and remanding for the payment of benefits or, alternatively, for a new hearing; and Defendant requests that the Commissioner's decision be affirmed.  The Court has taken the parties' Joint Stipulation under submission without oral argument.

**SUMMARY OF ADMINISTRATIVE PROCEEDINGS**

Plaintiff's mother filed an application for SSI disabled child's benefits on Plaintiff's behalf on October 23, 2002. (Administrative Record ("A.R.") 44-46.) Plaintiff was born on December 6, 1993, and was in the third grade at the time the application on his behalf was filed. (A.R. 44.) That application claims that Plaintiff has been disabled since September 1, 2002, due to attention deficit hyperactivity disorder and a learning disorder. (A.R. 14, 44.)

The Commissioner denied Plaintiff's claim for benefits initially and upon reconsideration. On August 25, 2003, Plaintiff and his mother, who were not represented by counsel, testified at a hearing before Administrative Law Judge John Belcher ("ALJ"). (A.R. 207-39.) On September 29, 2003, the ALJ denied Plaintiff's request for benefits, and the Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision. (A.R. 5-7, 13-18.)

**SUMMARY OF ADMINISTRATIVE DECISION**

In his September 29, 2003 written decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (A.R. 18.) The ALJ further found that Plaintiff had "severe" impairments, consisting of an attention deficit hyperactivity disorder and a learning disorder, but that Plaintiff did not have an impairment or combination of impairments listed in, or medically equivalent to an impairment listed in, Appendix 1, Subpart P, Regulation No. 4 pursuant to 20 C.F.R. § 416.924(d). (*Id.*) The ALJ

further found that Plaintiff's subjective complaints did not credibly establish a more restrictive residual functional capacity than the ALJ found, and did not establish "marked or severe functional limitations." (*Id.*)  Accordingly, the ALJ found that Plaintiff was not disabled according to 20 C.F.R. § 416.924(d).  (*Id.*)

**STANDARD OF REVIEW**

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).  The Commissioner's decision must stand if it is supported by substantial evidence and applies the appropriate legal standards.  Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  Substantial evidence is "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995).

Although this Court cannot substitute its discretion for that of the Commissioner, this Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion."  Desrosiers v. Secretary of Health and Human Serv., 846 F.2d 573, 576 (9th Cir. 1988); *see also* Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995).  This Court must uphold the Commissioner's decision if it is supported by substantial evidence and

free from legal error, even when the record reasonably supports more than one rational interpretation of the evidence. *Id*. at 1041; *see also* Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 599 (9th Cir. 1999); Flaten v. Secretary, 44 F.3d 1453, 1457 (9th Cir. 1995).

**DISCUSSION**

Plaintiff alleges two issues. First, Plaintiff contends that the ALJ erred by failing to properly consider the opinion of disability submitted by his treating physician. Second, Plaintiff contends that the ALJ improperly rejected the testimony proffered by his mother. (Joint Stip. at 3.)

The following definition of disability governs the determination of Plaintiff's claim:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(I). An impairment meets the "marked and severe functional limitations" requirement if it meets, medically equals, or functionally equals an impairment set forth in the Listing.

20 C.F.R. § 416.924(d).[1]  Thus, a child claimant must show that his impairment meets, medically equals, or functionally equals an impairment described in the Listings in order to be awarded benefits. *See* 20 C.F.R. §§ 416.911 and 416.924(d)(1).

**A.  The ALJ's Ultimate Determination Was Based On An Improper Consideration Of The Evidence, And The Record Needs To Be Further Developed.**

Ordinarily, the opinions of a treating physician should be given great, if not controlling, weight. *See* Social Security Ruling 96-2p. When the ALJ rejects the opinion of a treating physician, even if it is contradicted, the ALJ may reject that opinion only by providing specific and legitimate reasons for doing so, supported by substantial evidence in the record. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); *see also* Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)(ALJ erred by rejecting the treating physicians' opinions and relying upon Social Security examiners' opinions in finding that claimant's chronic fatigue syndrome had not rendered her disabled). Broad and vague reasons will not suffice for rejecting the treating physician's opinion. McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989). Furthermore, "[t]he Commissioner must provide 'clear and convincing' reasons for rejecting

---

[1] 20 C.F.R § 416.924 sets out a three-step sequential evaluation process for childhood disability claims. The first step is to determine whether or not the claimant is engaging in substantial gainful activity. If not, the second step is to determine whether the child's impairments are severe. At step three, a child will be found to be disabled, if he or she has an impairment(s) which meets or medically equals in severity the criteria for an impairment listed in the "Listing of Impairments" in Appendix 1 of subpart P of the Commissioner's disability regulations, 20 C.F.R., Part 404, or if the impairment(s) is (are) functionally equal in severity to a listed impairment.

the uncontradicted opinion of an examining physician." Lester, 81 F.3d at 830 (citing Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990).

In discussing Plaintiff's treating records, the ALJ stated:

> September 2002 treatment notes from Arrowhead Regional Medical Center reveal [Plaintiff] was having behavioral problems at school. Physical examination was unremarkable. Vision tests show [Plaintiff] had 20/20 vision with both eyes. [Plaintiff] was diagnosed with possible ADHD (Exhibit 1F).
>
> September 17, 2002 treatment notes from Dr. Multani, [Plaintiff's] treating physician, reveal [Plaintiff's] diagnosis of attention deficit hyperactivity disorder (ADHD). Dr. Multani noted [Plaintiff] had good physical health but had poor attention span and concentration and cannot carry out tasks. Dr. Multani placed [Plaintiff] on Wellbutrin. Treatment notes dated November 22, 2002 show [Plaintiff] was alert and oriented and had a stable mood. He was less distracted and doing better on his medication. He had no side-effects from his medication. On January 16, 2003 [Plaintiff] continued to do better on his medication. His mood was more stable and his concentration had improved, although his judgment was still poor and he was hyper at night (Exhibit 4F).
>
> . . . .

> Treatment notes from San Bernardino County Department of Behavioral Health dated February 14, 2003 reveal [Plaintiff's] diagnosis of ADHD, combined. [Plaintiff] was placed on medication and advised to supplement his diet with vitamins and Pediasure. On April 25, 2003 [Plaintiff's] mother reported [Plaintiff] was doing better. On May 28, 2003 [Plaintiff] was doing fairly well, had no behavior problems, and had no hyperactivity. July 25, 2003 treatment notes reveal [Plaintiff] did better in the morning but worse in the afternoon. On August 29, 2003 [Plaintiff] was doing well on his medication. He was less hyperactive and less impulsive (Exhibit 8F).

(A.R. 16.)

In reaching his ultimate conclusions regarding Plaintiff's disability, the ALJ relied on the testimony of Dr. Hubbard, the medical expert, whose testimony the ALJ summarized as follows:

> Dr. Hubbard, a specialist in pediatrics, appeared as a medical expert and reviewed all of the medical evidence of record. Dr. Hubbard cited the above summarized medical evidence of record and stated as of [Plaintiff's] application date he carried the diagnosis of attention deficit hyperactivity disorder and a learning disorder concerning written language. Dr. Hubbard noted [Plaintiff] liked science best, liked math, did not like reading, but was still in the GATE [Gifted and Talented Education] program. Dr. Hubbard testified

7

> [Plaintiff] was devoid of any evidence of a limitation in interacting and relating to others, moving about and manipulating objects, caring for himself, and health and physical well-being. [Plaintiff] was less than marked in acquiring and using information based on his problems with writing, although his psychological testing showed no cognitive deficits with verbal IQ of 128 and full scale IQ of 123. [Plaintiff] was only marked with regard to difficulty in maintaining concentration, persistence, and pace. The teacher's questionnaire [completed by Plaintiff's third grade teacher] showed [Plaintiff] had difficulty completing tasks, was easily distracted, and was the last to finish assignments. Since starting on his medication [Plaintiff] was less fidgety. Reading was at 2nd grade level, writing was at 1st grade level, and his attention was slightly improved.

(A.R. 17.)

Plaintiff contends that the ALJ failed to provide specific and legitimate reasons for rejecting the opinions and diagnoses of Dr. Gurmeet Multani, Plaintiff's treating physician. Specifically, Plaintiff contends that Dr. Multani's Global Assessment of Functioning ("GAF") of 45 is effectively an "opinion of disability," and the ALJ committed "material error" by failing to consider or address this in his opinion.[2]  (Joint Stip. at 3-4.)

---

[2] A GAF of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few

In the September 17, 2002 record to which Plaintiff refers, Dr. Multani diagnosed Plaintiff with "attention deficit hyperactivity disorder" and assessed him with a "poor" GAF of "45/85." (A.R. 131.) Other treatment records from 2002 note Plaintiff's inability to focus, attention problems, and hyperactivity.[3] More recent treating records from 2003 show that Plaintiff improved with medication, but his hyperactivity (as demonstrated by his somersaults in the waiting room and "multiple gymnastics" during a counseling session in March 2003) by no means had resolved and, thus, his ability to function in the classroom remained compromised.[4]

---

friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders Text Revision, 34 (4th ed. 2000) ("DSM-IV-TR").

[3] A.R. 121 -- November 22, 2002 Client Plan, observing that Plaintiff had decreased attention and was "unable to carry out functions"; 122-23 -- November 22, 2002 assessment, noting that Plaintiff exhibited "poor concentration," "limited attention span," "poor judgment and insight," "poor impulse control," and "pressured" speech.

[4] A.R. 174 -- Dr. Lina Shuhibar's February 14, 2003 counseling notes, observing "difficulty paying attention and focusing on school work" and "hyperactivity," but "no mood or psychotic [symptoms]"; A.R. 173 -- Dr. Shuhibar's March 18, 2003 counseling notes, observing "no real change [with] attention," "continues [to be] hyperactive," was "[d]oing [somersaults] in the waiting room," "doesn't want to write," had decreased "reading performance," was "hyperactive," and performed "[multiple] gymnastic moves during visit"; A.R. 172 -- April 25, 2003 counseling notes, observing that Plaintiff was "[d]oing better [with] increased dose of Dexhost," was "calm, friendly," and exhibited "[no] hyperactivity"; A.R. 171 -- Dr. Shuhibar's May 28, 2003 counseling notes, stating that Plaintiff was "doing fairly well at home and school," had "no behavior problems at school," exhibited "[no] hyperactivity" and "[no] tics," and expressed a "bright mood and affect"; A.R. 169 -- Dr. Shuhibar's July 25, 2003 counseling notes, observing that Plaintiff is "worse in the afternoon" and "can't focus after 12 noon," and that he does "[somersaults] through [the] house"; 198 -- Dr. Shuhibar's August 29, 2003 counseling notes, observing that Plaintiff was "[d]oing well with Strattera," "eating better," "less hyperactive," and "less impulsive and talkative," but having "poor sleep"; 206 -- Dr. Shuhibar's September 26, 2003 counseling notes, observing that Plaintiff exhibited "[no] hyperactivity [or] tics," but was "not doing 90% of work in class [and] on probation at school," had

Defendant's point is well-taken that a GAF score does not constitute an opinion of disability. Moreover, a GAF score is not determinative of a mental disability for social security claim purposes. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01 (August 21, 2000)("We did not mention the GAF scale to endorse its use in the Social Security and SSI disability programs, . . . [The GAF scale] does not have a direct correlation to the severity requirements in our mental disorder listings"); Howard v. Commissioner, 276 F.3d 235, 241 (6th Cir. 2002)(rejecting the claimant's argument that the ALJ improperly failed to consider her GAF score from her treating physicians in assessing her residual functional capacity, reasoning that "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.").

Nevertheless, the Court cannot confirm that the ALJ's consideration of Plaintiff's treating records and his assessment of Plaintiff's impairments were based on substantial evidence in this case. The ALJ concluded that Plaintiff's impairments not were the functional equivalent of any impairment in the Listings, after performing an analysis of Plaintiff's limitations in the following five areas of functioning: cognitive and communicative development; motor development; social development; personal development; and

---

a "poor appetite," and was "disorganized"; 205 -- Dr. Shuhibar's October 24, 2003 counseling notes, observing that Plaintiff was "[d]oing better" with "improved attention and concentration," "sits still in chair today [for the first] time," and "[no] hyperactivity [or] tics," but "still unable to do [homework] in the afternoon"; A.R. 126 -- November 22, 2003 progress record, noting that Plaintiff was "less distracted with the medication."

concentration, persistence, and pace. (A.R. 15.) The ALJ observed that, in order to prevail on a "functionally equivalent" claim, a child claimant must demonstrate "extreme" functional limitation in at least one, or "marked" functional limitation in at least two, of the these areas. (*Id.*) In reaching his conclusions regarding the functional equivalence of Plaintiff's limitations, the ALJ relied upon the findings of Dr. Hubbard, the medical expert, who found that the Plaintiff had "marked" limitations in only one area -- concentration, persistence, and pace. (A.R. 17.)

It appears that the ALJ relied on the incorrect standard in his functional equivalence analysis. Specifically, on September 11, 2000, the Commissioner published the Final Rules implementing the Welfare Reform Act (the "Final Rules"), which became effective on January 2, 2001, well before the date of the ALJ's decision in this case.[5] The Final Rules replaced the previous "five broad areas of functioning" in the functional equivalence analysis, and now require that the ALJ analyze Plaintiff's limitations in the following six domains: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for yourself; and 6) health and physical well-being. 20 C.F.R. § 416.926a(2)(b)(1)(I)-(vi); Garrett v. Barnhart, 366 F.3d 643, 650-51 (8th Cir. 2004)(explaining the changes in the prior "Interim Rules" with the Final Rules ). Under the Final Rules, a child has a "marked" limitation when the impairment interferes seriously with the

---

[5] Supplemental Security Income; Determining Disability for a Child Under Age 18, 65 Fed. Reg. 54,747 (Sept. 11, 2000)(codified at 20 C.F.R. pts. 404, 416).

child's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). Further, "[m]arked' limitations also means a limitation that is 'more than moderate" but 'less than extreme.'" *Id*. A child will be found to have an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3).

At the August 25, 2003 hearing, Dr. Hubbard testified that Plaintiff's records showed "no cognitive and communicative limitation" and only "marked" limitation in one of the five areas of functional equivalence under the former standard (*i.e.*, maintaining concentration, persistence, and pace), and that Plaintiff's communicative abilities were "superior." (A.R. 232-33.) Dr. Hubbard further noted that Plaintiff's problems with reading and writing did not result in any communicative disability, and stated that one of his school records indicated that he was reading at grade level. (*Id*.)

Despite the fact that Dr. Hubbard's testimony addressed at least some of the six domains for the functional equivalence analysis set forth in the Final Rules and the current version of Section 416.924a (*see* A.R. 231-35), his testimony nevertheless does not support the ALJ's ultimate determination that Plaintiff is not disabled under the functional equivalent analysis -- even when reviewed by the correct standard. Indeed, Dr. Hubbard's testimony does not appear to be entirely accurate and supported by the record. For instance, although Dr. Hubbard cited a school record noting that Plaintiff was reading at grade level, as the ALJ himself observed, a June 23, 2003 report

12

completed by Ms. Elizabeth Curtis, Plaintiff's third grade teacher, indicated that Plaintiff "has not turned any writing in this trimester" and "in writing, the work is just getting too difficult for him." (A.R. 161.) In addition to Ms. Curtis's observations, in an October 8, 2003 report, Dr. Ivette McNally, a school psychologist, noted that, although Plaintiff has an full scale IQ of 125 and can function in the superior range of intelligence, he was placed in special education classes in view of his "sensory motor deficits [and] attention processing deficits [which] interfere with his ability to acquire reading [and] writing skills." (A.R. 189.) Dr. Hubbard also cited the December 26, 2002 report of Dr. Nicholas Andonov, a psychologist who examined Plaintiff at the request of the Commissioner, for his conclusion regarding Plaintiff's intelligence and functional limitations. (A.R. 233.) However, it cannot be confirmed that Dr. Andonov's opinion has a proper foundation, because it appears that he did not review Plaintiff's complete record.[6] Accordingly, Dr. Hubbard's conclusion that Plaintiff had "less than marked" limitations, particularly in the domains of his abilities to acquire and use information, to attend and complete tasks, and to manipulate objects, is not adequately supported by substantial evidence.

---

[6] Dr. Andonov assessed Plaintiff with a full-scale IQ of 123 (placing him in a superior range of intelligence); diagnosed him with disruptive behavior disorder, not otherwise specified; concluded that "there are no cognitive deficits and no indication of attention deficit disorder"; and recommended that Plaintiff should be placed in gifted classes. (A.R. 106-09.) However, Dr. Andonov's report states that he reviewed only one record, *i.e.*, Dr. Multani's September 17, 2002 report, and did not review any school records. (A.R. 106.) 20 C.F.R. §§ 404.1517, 416.917 ("[i]f we arrange for [a consultative] examination or test, . . . [w]e will also give the examiner any necessary background information about your condition").

Unfortunately, the records of Plaintiff's treating physicians and school counselors/teachers do not provide clear evidence regarding the nature and extent of Plaintiff's impairments[7] and their impact on him in the six domains listed above, which would shed critical light on the ultimate determination on this case. While it may be that Plaintiff has neither "marked" nor "extreme" limitations in more than one of these areas, the ALJ's summary description of Plaintiff -- that he is "a very smart lad" whose problems were caused merely by his dislike of reading -- appears to be without proper basis.

Similarly, Defendant's contention that the record demonstrates that Plaintiff is "gifted" and, therefore, cannot be disabled is unpersuasive; it is possible that Plaintiff may be both. Especially in view of the fact that Plaintiff and his mother were unrepresented at the hearing, the ALJ should further develop the record by re-contacting these sources, and perhaps contacting a psychologist with expertise in the field of learning disorders, so that they may have the opportunity to provide further information concerning Plaintiff's impairments, especially with respect to the six domains listed above.[8] After the

---

[7] As stated by the ALJ, Dr. Hubbard, a specialist in pediatrics, diagnosed Plaintiff as having attention deficit hyperactivity disorder and "a learning disorder concerning written language." (A.R. 17.)

[8] See Higbee v. Sullivan, 975 F.2d 558, 561-62 (9th Cir. 1992)("[W]here the claimant is not represented, it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."); see also Brown v. Heckler, 713 F.2d 441, 442-43 (9th Cir. 1993)(the Commissioner has an affirmative duty to develop the record, even if the claimant is represented by counsel); 20 C.F.R. § 416.912(e)(duty to re-contact treating physician); Thomas v. Barnhart, 278 F.3d 947, 956-57, 959 (9th Cir. 2002)(requirement in 20 C.F.R. § 416.912(e) that the Commissioner re-contact treating sources is triggered where the information from the treating sources is inadequate

record is adequately clarified and developed, the ALJ should seek an opinion from a medical expert as to the severity of Plaintiff's impairments based on the complete medical record.[9]

Accordingly, the ALJ's ultimate determination regarding Plaintiff's impairments constitutes error.

**B.   On Remand, The ALJ Should Reconsider His Assessment Of The Testimony Provided By Plaintiff's Mother Regarding Plaintiff's Impairments.**

"Lay testimony as to a claimant's *symptoms* is competent evidence that an ALJ *must* take into account, unless he or she expressly determines to disregard such testimony and *gives reasons germane to each witness for doing so.*"  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)(emphasis added).  *See also* Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996); Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). An ALJ may "properly discount lay testimony that conflict[s] with the available medical evidence" (Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984)), particularly, where, as in Vincent, "lay witnesses [are] making medical *diagnoses*," as "[s]uch medical diagnoses are beyond the competence of lay witnesses and therefore do not constitute competent evidence."  Nguyen, 100 F.3d at 1467 (original emphasis). When, however, a lay witness testifies about a claimant's *symptoms*,

---

to make a determination regarding disability).

[9]  *See* 20 C.F.R. §§ 404.1519a(b), 416.919a(b) (listing situations requiring a consultative examination, such as a conflict, inconsistency, ambiguity, or insufficiency in the evidence).

15

which may affect the claimant's ability to work, such testimony *is* competent evidence and therefore *cannot* be disregarded without comment. *Id*.  In Dodrill, the Ninth Circuit explained the importance of lay testimony, stating:  "Although eyewitnesses have to rely to some extent on communications with the claimant in ascertaining whether she is disabled or malingering, we have held that friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition."  12 F.3d at 919 (citing Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987)).

Plaintiff contends that the ALJ erred in not explaining the weight that he placed on the descriptions of Plaintiff's symptoms provided by his mother at the hearing.  In discussing the testimony of Plaintiff's mother, the ALJ stated:

> [Plaintiff's] mother testified [Plaintiff's] school work was going down.  She said his IQ is high and his verbal communication is good but after 12:00 p.m. he will not sit down and he is everywhere.  [Plaintiff's] mother testified [Plaintiff] gets up early to do his homework and his attendance has improved.

(A.R. 17.)

This case is being remanded so that the ALJ can reconsider the severity of Plaintiff's impairments in accordance with the proper legal standard and further develop the record.  Ms. Solis's testimony regarding Plaintiff's limitations and symptoms is relatively brief (*see*

16

A.R. 215-19), and the ALJ also should reconsider her testimony on remand of this case in rendering his ultimate determination regarding Plaintiff's disability.

**C.  Remand Is Required.**

Here, remand is appropriate to allow the ALJ the opportunity to correct the above errors.  *See* McAllister, 888 F.2d at 603 (remand appropriate to remedy defects in the record).

**CONCLUSION**

Accordingly, for the reasons stated above, the denial of benefits is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.  Judgment shall be entered reversing the decision of the Commissioner, and remanding the matter for further administrative action consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and for Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: July 31, 2006

/s/
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

17